ROBERTSON, Justice:
Plaintiff, Will Parkinson, a minor, by his father and next friend, sued defendants, Walter Williamson, a Minor, Jim Black-mon, a minor, and Wayne Ross, a minor, in the Circuit Court of Washington County, Mississippi for $400,000.00 damages for the loss of his left leg below the knee. His leg had to be amputated below the knee because both bones were shattered by a shot from a 30.06 rifle, accidentally fired by Wayne Ross.
After a full trial, the trial court sustained a motion for a directed verdict in favor of defendant, Jim Blackmon. The court overruled motions for directed verdicts in favor of defendant Walter Williamson and defendant Wayne Ross.
The case was submitted to the jury and the jury, by 12 individual verdicts, each written in the handwriting of a different juror, returned a unanimous verdict for defendants Walter Williamson and Wayne Ross.
Parkinson does not appeal from the directing of a verdict for Jim Blackmon, but does appeal from the judgment, based on the jury verdict, in favor of defendants Williamson and Ross.
Parkinson assigns as error that the trial court erred:
1.
[I]n failing to grant Plaintiff’s motion to strike the affirmative defenses alleged by the Defendants of engagement of the parties to this action in a joint venture and criminal act.
*778 2.
[I]n granting Instruction Number 11 for Defendant Ross.
3.
[I]n granting Instruction Number 12 for Defendant Ross.
4.
[I]n instructing the jury on behalf of Defendant Williamson as follows:
“The Court instructs the jury for the Defendant, Walter Williamson, that the word ‘negligence’ used in these instructions means the doing of something which a reasonably prudent person would not have done under like circumstances or the failure to do something which a reasonably prudent person would have done under like or similar circumstances.”
5.
[I]n failing to direct a verdict against the defendant, Wayne Ross.
6.
[I]n overruling Plaintiff’s alternative motion for judgment notwithstanding the verdict or for a new trial.
7.
[I]n refusing to grant the Plaintiff the following instruction:
“The Court instructs the jury for the Plaintiff that, under the law of the State of Mississippi, firearms are considered extraordinarily dangerous and that the highest degree of care is required of one who handles a firearm; that where a person handles a firearm which is discharged, he is liable for any injury caused thereby unless he shows by a preponderance of the evidence that he was entirely without fault. Accordingly, you are further instructed that if you believe from a preponderance of the evidence, if any, that Defendant, Wayne Ross was handling a firearm which discharged into Plaintiff’s body and that such discharge proximately caused or proximately contributed to the shooting, and injuries, if any, of the Plaintiff, then it is your sworn duty to return a verdict for the Plaintiff against Defendant, Wayne Ross, unless you believe from a preponderance of the evidence that Defendant, Wayne Ross, was entirely without fault in the handling of such firearm.”
On Saturday afternoon, March 7, 1970, Will Parkinson, Wayne Ross, Walter Williamson, Jim Blackmon, Danny Jones, James Dunaway and Jesse Brent rode around in Brent’s dune buggy in the vicinity of Lake Ferguson and in Greenville, Mississippi. Parkinson drank one or two cans of beer during the afternoon. About 7:00 P.M., after securing their parents’ permission to camp out, 16-year old Parkinson and his young friends, including the defendants, bought vodka and orange juice and prepared mixed drinks therewith.
From about 8:00 until 11:00 P.M., Black-mon and Dunaway were separated from the others, and during this period continued to drink vodka and orange juice and about 11:00 P.M. Blackmon passed out.
About midnight, Williamson, Ross and Parkinson broke into a cabin on Lake Ferguson and stole a shotgun, a 22 rifle, and a 30.06 rifle. Although they had gone to Lake Ferguson with Jesse Brent in his car, Brent took no part in the breaking and entering of the Morehead cabin from which the guns were stolen. When they had come out of the cabin and were under an outside light at the Girl Scout camp, the three stolen guns were passed around and were checked by Williamson, Dunaway, Parkinson and Ross.
Brent, Parkinson, Williamson and Ross, in Brent’s Mustang, found Blackmon’s Volkswagen headed into a roadside fence and Blackmon in it, passed out. Ross and *779 Parkinson got into Blackmon’s Volkswagen, put Blackmon on the back seat, and departed, with Ross driving and Parkinson on the front seat with him, “riding shotgun” as Parkinson expressed it. Brent and Williamson, in Brent’s Mustang, took the three guns to some point on the Mississippi River levee and hid them. Brent took his Mustang home and, having been denied permission to camp out he sneaked out, and joined Ross, Parkinson, Williamson and Blackmon in Blackmon’s Volkswagen.
About 2:30 A.M. Sunday, March 8, these five teenagers decided to drive to Vicksburg from Greenville, and they did so with Ross driving Blackmon’s Volkswagen. Parkinson testified that on this trip to and from Vicksburg he and Williamson were the principal drinkers of the vodka and orange juice. When they returned from Vicksburg shortly after sunup on Sunday morning, they took Jesse Brent home. Worried about the stolen guns not being hidden well enough, they returned to the Mississippi River levee, and Parkinson and Williamson put the guns on the rear floor of the Volkswagen with a sleeping bag on top of the guns. They then went to a Junior Food Mart in Greenville. Black-mon and Parkinson were on the back seat, Wayne Ross was driving and Williamson was seated on the front seat beside the driver.
The testimony becomes confused at this point, but it appears that Williamson and Parkinson went in the Junior Food Mart, bought a Coke and some B.C. powders, and on returning to the Volkswagen Williamson and Parkinson swapped seats, with Williamson getting on the back seat and Parkinson on the right front seat.
All of them now give their undivided attention to picking a good spot to hide the stolen guns, and finally decide to hide them in the field next to the subdivision in which the Parkinson and Ross homes were located. In carrying out this plan, Ross drove the Volkswagen to the back of the field next to a ditch and parked it. Parkinson got out the right door, pulled the shotgun out from under the bedding roll, and moved around with it outside the open right door of the Volkswagen. Ross got out the left door, reached in, took hold of the 30.06 rifle, and attempted to pull it out of the left door of the Volkswagen. It was then that the 30.06 rifle fired and the full charged hit the rear portion of Parkinson’s left leg, shattering both bones below the knee.
Ross, when he saw what had happened, screamed and ran to his home nearby. Blackmon and Williamson took Parkinson to the hospital where his left leg was amputated about 2Yz inches below the knee.
It is perfectly clear to this Court that Parkinson, Williamson and Ross were all actively engaged together in the commission of a felony from beginning to end, from the breaking and entering to the attempt to hide the stolen guns in the field selected by all of them acting together. Parkinson expressed what was on all their minds, in this way:
“Q. When was the first time you remember your having in your mind the hiding of the guns ?
“A. I would guess probably right after we stole them.
“Q. You say that was your continual idea, from the time you stole them until the time you got to the field, that the guns would be hidden ?
“A. Well, from the minute we stole the guns I started thinking about what we would do with them. I can’t say exactly hiding them.”
These guns were stolen guns; they did not belong to Parkinson, Williamson or Ross. They were not in the sole and exclusive possession of any one of the three boys; they were wrongfully in their common possession from the time they were stolen until the shotgun and 30.06 rifle were removed from the Volkswagen by Parkinson and Ross for the avowed pur *780 pose of hiding them. There was testimony, which the jury had a right to believe, that the last person to handle the 30.06 rifle before Ross attempted to pull it from the car, was the plaintiff, Will Parkinson. The testimony was that Parkinson handled it on the way from the levee to the Junior Food Mart.
In view of the fact that both Williamson and Ross were entitled to directed verdicts in their favor, it is unnecessary for us to take up and decide each assignment of error. The jury, with its verdict, cured the error of the court in overruling the motions of Williamson and Ross for directed verdicts. The jury reached the only verdict they could reach where the testimony, largely adduced by the plaintiff, clearly showed that all three of these teenagers were actively engaged in the commission of a criminal act (felony) from beginning to end, and their sole purpose at the time of the shooting was to finish the job by hiding the loot. It was a tragic accident, but all three were jointly and collectively engaged in the commission of a criminal act, and all must bear equal responsibility for what happened. No one of the three could recover from the other two; each was a particeps criminis.
Parkinson urges that the rule of highest degree of care in handling firearms laid down in State for the Use of Johnston et al. v. W. W. Cunningham et al., 107 Miss. 140, 65 So. 115 (1914), should apply in this case. There are no similarities whatsoever between Johnston v. Cunningham and this case. W. W. Cunningham, Sheriff of Prentiss County, and the sureties on his official bond, were sued for the wrongful death of Frank Johnston who was shot and killed by the sheriff. Johnston was 20 years old, and a hunchback. On Sunday, September 18, 1910, at a church meeting in the country, he became engaged in a fight or disturbance of the peace with other boys. When the sheriff and his deputies approached, Johnston ran off through the woods and was followed by the officers. After running a short distance, the sheriff drew his pistol and fired. Johnston dropped instantly, shot in the head, and died shortly thereafter.
In Johnston, the Court found:
“There can be no question that a sheriff and the sureties on his official bond are liable in a civil action for damages arising from the intentional or negligent shooting of a misdemeanant who flees to avoid arrest.
“The proof in this case clearly establishes that the sheriff fired his pistol willfully and intentionally, and his act in so doing amounted to negligence.
“However it is our view of the case that appellees should be held liable because of the negligent, careless, reckless, willful, intentional, wrongful, and unjustifiable discharge by the sheriff of his pistol while he was in pursuit of the deceased, who had only committed a misdemeanor.” (Emphasis added.) 107 Miss, at 149, 151, 152, 65 So. at 117, 118.
The differences between that case and the case at bar are clear and apparent. We need say no more in support of our finding here that the rule announced in Johnston is simply not applicable where one active participant in a criminal act (felony) is unintentionally injured by another participant.
The judgment of the trial court is affirmed.
Affirmed.
GILLESPIE, C. J., and PATTERSON, INZER and SMITH, JJ., concur.